IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| OSCAR SMALL | : | |
| | : | |
| V. | : | |
| | : | No. 5:12-CV-507 (CAR) |
| CEMEX SOUTHEAST, LLC | : | |
| ROBERT STAMBACK, AND | : | |
| PERRY STREETMAN, | : | |
| | : | |
| DEFENDANTS. | : | |
| | : | |

## ORDER ON MOTION FOR SUMMARY JUDGMENT

Plaintiff Oscar Small ("Plaintiff" or "Small") brings this employment discrimination action contending that Defendants, Cemex Southeast, LLC ("Cemex"), and Robert Stamback ("Stamback") (collectively "Defendants")[1], terminated him based on his race in violation of 42 U.S.C. § 1981.  Before the Court is Defendants' Motion for Summary Judgment [Doc. 25].  After fully considering the matter, the Court finds genuine issues of material fact exist as to whether Defendants terminated Plaintiff in violation of 18 U.S.C. § 1981, and therefore Defendants' Motion for Summary Judgment [Doc. 25] is **DENIED**.

## LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment must

---

[1] Plaintiff has conceded his hostile work environment claim against Defendants, as well as his race discrimination claim under section 1981 against Perry Streetman, and thus these claims are DISMISSED.

be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[2]  A genuine issue of material fact only exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."[3]  Thus, summary judgment must be granted if there is insufficient evidence for a reasonable jury to return a verdict for the nonmoving party or, in other words, if reasonable minds could not differ as to the verdict.[4]  When ruling on a motion for summary judgment, the court must view the facts in the light most favorable to the party opposing the motion.[5]

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact" and that entitle it to a judgment as a matter of law.[6]  If the moving party discharges this burden, the burden then shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact.[7]  This evidence must consist of more than mere conclusory allegations or

---

[2] Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

[3] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

[4] *See id.* at 249-52.

[5] *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir. 1992).

[6] *Celotex Corp.*, 477 U.S. at 323 (internal quotation marks omitted).

[7] *See* Fed. R. Civ. P. 56(e); *see also Celotex Corp.*, 477 U.S. at 324-26.

legal conclusions.[8]

## BACKGROUND [9]

Plaintiff Oscar Small, an African-American male, was employed by Defendant Cemex, a cement manufacturing company, in its Clinchfield facility. Cemex's Clinchfield facility uses a machine called a "reclaimer" to mine limestone rock. Thereafter the stone is ground into a powder, and baked in an industrial kiln. The baked stone, known as clinker stone, is the main ingredient in Cemex's cement product. Plaintiff began working at Cemex's Clinchfield plant as a laborer in 1995.

During the course of his employment, Plaintiff became part of the maintenance staff and held the position of a Repairman/Journeyman. As part of his duties, he repaired various machines and equipment at the plant.  One of the machines that he regularly repaired was the reclaimer.  The reclaimer is repaired, on average, at least once per week. The reclaimer is a large and complex machine that digs into a pile of

---

[8] *See Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991).

[9] Defendants contend that Plaintiff has failed to abide by Local Rule 56 in regards to his objections to Defendants' Statement of Material Facts, and, therefore, has admitted to all the facts of this case as presented by Defendants.  Defs. Reply Br., Doc. 34 at 2. However, it is Defendants that "continue[] to shoulder the initial burden of production in demonstrating the absence of any genuine [dispute] of material fact, and the court must satisfy itself that the burden has been satisfactorily discharged." *Reese v. Herbert*, 527 F.3d 1253, 1268 (11th Cir. 2008)**.**  Moreover, the Court must **"**review the movant's citations to the record to determine if there is, indeed, no genuine issue of material fact." *Id.* at 1269 (quotation and internal quotation marks omitted).  The Court has so reviewed the record, and viewed in the light most favorable to Plaintiff, and finds the facts for purposes of summary judgment to be as follows in this section.

rocks that is approximately 30-40 feet high at 180-200 feet wide. The reclaimer's purpose is to gather stones and rocks from large piles mined from the site's quarry and then load the stones onto a conveyor belt; the rocks are then transported to the plant for processing of the rock into clinker stone.

The reclaimer is made up of several subparts. One of the subparts is called the "main chain." The main chain moves a series of metal buckets that pick up rocks from the pile and carries them to the conveyor belt. The main chain is a large metal chain, 250 feet from end to end and a total length of 550 feet. It is similar to a large bicycle chain and moves about 50 feet per minute towards the rock. Serious bodily injury, dismemberment, and perhaps even death would result if the main chain were activated and not locked out while an individual was performing maintenance on it.

Another subpart of the reclaimer is the "travel." The travel is a set of grooved metal wheels similar to those found on railroad cars that run along a metal bar just like a train rolls along on a track. The travel moves the rest of the reclaimer left and right as the reclaimer digs into a pile of rocks. The maximum speed of the travel is 1 mile per day. Working on the travel also poses a risk of serious injury if it is not locked out because the entire reclaimer could move and knock a repairman over.[10]

---

[10] Dec. of Frans Meens, Doc. 26-2 at para. 15, 16. Defendant asserts that there is a much lower risk of being "pinned and injured by the travel" than the risks associated with other reclaimer parts. *Id*. at 15. Plaintiff objects to this statement as improper opinion evidence because the affiant has not been presented or qualified as an expert witness. This Court however will neither discuss this objection nor the three other similar

In 2011, following a series of preventable mining accidents, the Mine Safety Health Administration ("MSHA") began heavily enforcing lockout/tagout policy violations. "Lockout/tagout" refers to safety procedures used in the maintenance process to ensure that machines are properly shut off, de-energized, and incapable of operation before maintenance or repair is completed. Before beginning maintenance on equipment that has electric power or that may move or rotate during operation, locks must be placed on power sources or "breakers" and/or at other locations to ensure the equipment remains inoperable until maintenance is complete. Each maintenance employee is issued an individual lock with the employee's lock number so that others may identify who the lock belongs to during maintenance.  When multiple employees are working on a piece of equipment, they use a "group lock" on the breaker for that area and attach their individual locks to it. Lockout procedures are intended to prevent injuries, and even deaths.

In 2011, Cemex instituted a "zero-tolerance" policy for safety violations in compliance with the regulations propagated by the MSHA. Lockout/tagout procedure violations were specifically highlighted as a violation of the zero-tolerance policy. All employees, including Plaintiff, received training on the zero-tolerance policy. Under the zero-tolerance policy "the failure to properly apply Lockout/Tagout procedure to

---

objections asserted in Plaintiff's Response to Defendants' Statement of Material Facts (SOF 27, 70, 89) because it is unnecessary for resolving the present Motion, and it is unclear what Plaintiff's specific objections are at this time.  If Plaintiff continues to have admissibility objections, such should be raised in specific form at a later date.

equipment" is a "Class A-Imminent Danger" violation, which could lead to "severe disciplinary action up to and including discharge on the first occurrence."[11]  Class A-Imminent Danger violations are "so egregious from a safety perspective in the opinion of management that it creates Imminent Danger. Imminent Danger violations could reasonably place an employee in immediate danger of serious bodily injury or death from one potential event."[12] Under Cemex's "Lockout/Tagout Procedures," employees who are working on the reclaimer are required to lock out the following breakers:

1. Reclaimer Chain Drive [the "main chain"]
2. Reclaimer travel drive – Side A
3. Reclaimer travel drive – Side B
4. Side A Harrow chain drives
5. Side B Harrow chain drives

When an employee is working on the main chain (#1, above) on the west end of the reclaimer, items 2 through 5 (above) are supposed to be locked out, as well as the disconnect for the reclaimer chain drive.[13]  When multiple employees are working on the main chain a group lock is attached to the corresponding breaker and individual locks are placed on the group lock. There is one breaker for the main chain and one breaker for the two travel drives, as well as a breaker each for the harrow chain drives.[14] The zero-tolerance policy does not define exceptions to its mandates regarding lockout/tagout procedures, and it applies equally to the main chain and the travel.

---

[11] Doc. 32-2 at 5.
[12] *Id*.
[13] Doc. 32-2 at 24.
[14] Small Dep., Doc. 31-1 at 83-85.

6

On the afternoon of June 29, 2012, four men were working on the reclaimer—Plaintiff, Scott Hooper, Ernest Holmes, and Charlie Walters.  Plaintiff was the only African-American; the other three repairmen were Caucasian. Plaintiff was working with Hooper on the main chain of the reclaimer changing buckets.   At the same time, Holmes and Walters were repairing the chute on the reclaimer.  It is undisputed that according to the lockout/tagout procedures, Plaintiff's and Hooper's individual locks should have been on the main chain group lock when they were working on it, and Holmes's and Walter's individual locks should have been on the travel group lock. The chute itself does not get locked, but when it is being worked on, the travel must be locked because if the travel is in motion, the entire reclaimer can move, and thus the chute can move.[15] Hooper, Holmes, and Walters had their individual locks on the main chain group lock; Holmes and Walters did not have their individual locks on the travel.

On that same afternoon, Plant Manager Robert Stamback conducted a tour around the plant. He observed Plaintiff, Hooper, Holmes, and Walters all working on the reclaimer. As he approached the reclaimer, he noticed that three locks were on the group lock. Stamback called Perry Streetman, Maintenance Supervisor, over to the group lock, and asked about the missing individual lock. An individual lock was lying on the ground, and Streetman identified Plaintiff as the owner of the lock.  Plaintiff

---

[15] Stamback Dep., Doc. 31-3 at 71.

asserts he was "walking into the tail area of the main chain" at that time.[16] All repair work was ordered to be stopped, and Stamback told Streetman to have Plaintiff put his lock on the main chain group lock.

Stamback then sought out Frans Meens, the safety manager at the plant, to discuss and pose the situation to him as a hypothetical.  In his hypothetical, Stamback told Meens that four employees were working on the reclaimer, three locks were on the group lock, and he found one lock on the ground. He asked Meens to offer an interpretation of the zero-tolerance policy as applied to the hypothetical fact pattern. Meens was not aware of the race of the individual or his name. Stamback's hypothetical did not distinguish between the parts of the reclaimer that the employees were working on. He did not mention that only two employees were working on the main chain, and the other two employees were working on the chute and failed to have their locks on the travel. Based on the hypothetical presented, Meens told Stamback that the employee who failed to lock out the equipment was in violation of the zero-tolerance policy.

Stamback returned to the area, and Streetman told Stamback that Plaintiff admitted his individual lock was not on the machine. Stamback then instructed Streetman to bring Plaintiff to the office for a meeting about the violation. At Stamback's direction Plaintiff then met with Stamback, Streetman, Meens, Ronnie Thompson, the Union President, Jason Harpe, the employees' Union Representative,

---

[16] Statement of Scott Hooper, Def. Ex. 14; Small Dep. Doc. 31-1 at 158.

8

and Andy Marzen, the Maintenance Manager, to discuss and investigate Plaintiff's failure to lockout/tagout. [17]   Explaining what happened when performing maintenance on the reclaimer, Plaintiff said he had been working on the reclaimer's main chain most of the day and had put his lock on and off many times.  Indeed, the evidence shows that when working on the main chain, employees will have to take their locks on and off 12 to 15 times.  Plaintiff claims that because he had to turn the breaker on and off while repairing the main chain, there was a "practice" of one person working on the chain while the other person is at the breaker to lock and unlock each other's locks. [18]   Plaintiff tried to explain that in fact it was his co-employee Holmes who had forgotten to put Plaintiff's individual lock back on the main chain group lock for him.[19]   Even though Plaintiff admitted that he knew it was his responsibility to put his individual lock on the main chain under the zero-tolerance policy, Plaintiff also informed Stamback that he had been the employee that "had put the group lock on the main chain so it was locked out."[20]   Had Plaintiff not put the group lock on in the first place, the reclaimer would not have been locked out, unless another repairman would have locked it out.  The parties dispute whether a repairman is still at risk when his individual lock is not on the

---

[17] Small Dep., Doc. 31-1 at 55.
[18] Doc. 26-3, at 25.
[19] Small Dep., Doc. 31-1 at 132.
[20] Doc. 26-3 at 25.

equipment, but the group lock is in place.[21]   When the group lock is in place the machine cannot move. Despite Plaintiff's explanation, Stamback told Plaintiff that he had violated the zero-tolerance lockout/tagout policy, and he "had to let him go."[22]

After learning of his potential termination, Plaintiff told Stamback that two other repairmen/maintenance employees working with him failed to lockout the travel. Stamback ordered an investigation and it was discovered that Holmes and Walters had not locked out the travel.   Holmes and Walters had been working on the chute; Defendants' lockout procedures required that they both lock out the travel; however, both failed to lock out the travel and instead had their individual locks on the group lock located on the main chain.  It is undisputed that failing to lock out the travel during maintenance of the reclaimer was a violation of the zero-tolerance policy, and that Holmes and Walters had violated the policy.[23]   However, Stamback told Plaintiff that despite the zero-tolerance policy, Cemex did not enforce locking out the travel when employees are working on the chute. Stamback stated that because the zero-tolerance policy of locking the travel was not enforced or "clearly communicated" in the past, he "did not consider this to be a terminable violation of the policy."[24]   However, it is undisputed that there are no exceptions in the zero-tolerance policy. Stamback then

---

[21] Defendants' Brief in Support of Its Motion for Summary Judgment ("MSJ"), Doc. 25-1 at 6.
[22] Doc. 26-3 at 25.
[23] Stamback Dep., Doc. 31-3 at 71-72.
[24] Doc. 26-3 at 25.

instructed the other three Caucasian repairmen to go back to work and lock out the travel.[25]

Stamback again told Plaintiff that because "what he did was a violation of the company's zero tolerance rule," he had to let him go.[26]  Plaintiff asked several times for a lesser punishment, but Stamback told him that he had "no leeway when it came to enforcement" of the zero-tolerance policy and told Plaintiff that his termination was effective immediately. [27]

According to Cemex's Human Resources Manager, Plaintiff was "not the first employee to violate the plant's lockout/tagout procedures, but he was the first to do so in Clinchfield after Cemex instituted the 'zero tolerance' policy in 2011."[28]  Although previous to Plaintiff's termination, two Caucasian contractors were terminated for violations of the lockout/tagout procedure, there is no evidence in the record as to how they violated the procedures, i.e., whether the contractors failed to lockout the main chain, the travel, or, if indeed, it even was the reclaimer. The record reveals the contractors were terminated for violating lock-out procedures.[29] Since Plaintiff's termination, two other employees have been terminated under the zero-tolerance policy, Andy Marzen and Ernest Holmes, both Caucasian.  Holmes was reinstated after

---

[25] *Id*.
[26] *Id*.
[27] *Id*.
[28] Dec. of Brett Lato, Doc. 26-1 at para. 3.
[29] Stamback Dep., Doc. 31-3 at 170-171.

an arbitrator's finding that because the zero-tolerance policy had not been bargained for under the collective bargaining agreement, Cemex did not have "just cause" to terminate Holmes under the zero-tolerance policy.[30] The cited reason in all five cases for termination was violation of the zero-tolerance policy. There is no evidence in the record that anyone has been terminated for specifically failing to lock out the main chain.

## DISCUSSION

Plaintiff claims Defendants terminated his employment because of his race, in violation of 18 U.S.C. § 1981.  Discrimination claims brought under section 1981 "have the same requirements of proof and [use] the same analytical framework" as claims brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a).[31] Title VII makes it unlawful for an employer to "fail or refuse to hire or [ ] discharge any individual, or otherwise [ ] discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race[.]"[32]

Claims of race discrimination based on circumstantial evidence, as is the case here, are evaluated under the familiar burden-shifting framework developed in

---

[30] Dec. of Brett Lato, Doc. 26-1 at para. 6. Holmes was working in the mill when he failed to lock out. *Id.* at 7.

[31] *Springer v. Convergys Customer Mgmt. Group*, 509 F.3d 1344, 1347 n.1 (11th Cir. 2007).

[32] 42 U.S.C. § 2000e-2(a)(1).

*McDonnell Douglas Corp. v. Green*.[33]  A plaintiff must first establish a *prima facie* case, or "facts adequate to permit an inference of discrimination."[34]  If the plaintiff does so, the burden then shifts to the employer to articulate some legitimate, nondiscriminatory reason for its action.[35]  If the employer meets this burden, the plaintiff then has an opportunity to show that the employer's proffered reasons for the adverse employment action were merely pretext for discrimination.[36]

**Prima Facie Case**

The contours of the *prima facie* case vary depending on the exact nature of the claim; however, the plaintiff's burden is not heavy, nor is it an onerous one.[37]  To establish a *prima facie* case of discriminatory discharge, Plaintiff must produce circumstantial evidence showing that he (1) is a member of a protected class; (2) was qualified for the position; (3) suffered an adverse employment action; and (4) was treated less favorably than a similarly situated individual outside his protected class or was replaced by a person outside of his protected class.[38]

"[I]n cases involving alleged racial bias in the application of discipline for violation of work rules," the plaintiff must show "either (a) that he did not violate the

---

[33] 411 U.S. 792 (1973).

[34] *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).

[35] *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

[36] *Id.* at 253.

[37] *See, e.g., Crapp v. City of Miami Beach*, 242 F.3d 1017, 1020 (11th Cir. 2001) ("the *prima facie* requirement is not an onerous one").

[38] *Maynard v. Bd. of Regents*, 342 F.3d 1281, 1289 (11th Cir. 2003).

work rule, or (b) that he engaged in misconduct similar to that of a person outside the protected class, and that the disciplinary measures enforced against him were more severe than those enforced against the other persons who engaged in similar misconduct."[39]

Defendant concedes, for purposes of summary judgment, that Plaintiff satisfies the first three elements of his *prima facie* case. The dispute here centers on whether Charlie Walters and Ernest Holmes are similarly situated comparators who engaged in similar misconduct, but were treated more favorably than Plaintiff. The Court finds that Walters and Holmes are sufficiently similar to maintain a *prima facie* case.

"When a plaintiff alleges discriminatory discipline, to determine whether employees are similarly situated, [the Court must] evaluate whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways."[40] In determining whether a comparator is similarly situated to the plaintiff, the Eleventh Circuit has stated that "[t]he relevant inquiry is not whether the employees hold the same job titles, but whether the employer subjected them to different employment policies."[41] "If the same policies were applied differently to similarly ranked employees, those employees may be compared."[42] Moreover, "when an

---

[39] *Jones v. Gerwens*, 874 F.2d 1534, 1540 (11th Cir. 1989).
[40] *Burke-Fowler v. Orange Cnty., Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006) (quotation omitted).
[41] *Id.*
[42] *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1326 (11th Cir. 2011).

14

individual proves that he was fired but one outside of his class was retained although both violated the same work rule, this raises an inference that the rule was discriminatorily applied."[43]

A proper comparator is an employee outside of the plaintiff's protected class who is similarly situated to the plaintiff "in all relevant respects."[44]  If the comparator is not similarly situated in all relevant respects, "the different application of workplace rules does not constitute illegal discrimination."[45]  However, "the quantity and quality of the comparator's misconduct must be nearly identical [to the plaintiff's] to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges."[46]  "The most important factors in a comparator analysis in the disciplinary context are the nature of the offenses committed and the nature of the punishments imposed."[47]  "If the same policies were applied differently to similarly ranked employees, those employees may be compared."[48]

Plaintiff offers Walters and Holmes as comparators. Plaintiff is African-American, and Walters and Holmes are Caucasian. All three of these men were employed as repairmen; they reported to the same supervisor; they were subject to the

---

[43] *Lanthem v. Dep't of Children & Youth Servs.*, 172 F.3d 786, 793 (11th Cir. 1999) (quoting *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1186 (11th Cir. 1984)).
[44] *Holifield*, 115 F.3d at 1562.
[45] *Lanthem*, 172 F.3d at 793.
[46] *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999); s*ee also Burke-Fowler*, 447 F.3d at 1323.
[47] *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1281 (11th Cir. 2008).
[48] *Smith*, 644 F.3d at 1326.

same zero-tolerance policy; and they all violated the zero-tolerance policy by failing to properly follow Cemex's lockout/tagout procedures. Plaintiff, however, was terminated, but Walters and Holmes were not. The Court is warned not to compare "apples to oranges"; however, in viewing the facts in a light most favorable to Plaintiff, the Court is presented with sufficiently similar comparators, Plaintiff, Holmes, and Walters; albeit different varieties of apples, are all apples nonetheless.

Although Defendants concede that the zero-tolerance policy applied to all three men, and that all three men violated the zero-tolerance policy by not properly locking out, they contend that Walters and Holmes are improper comparators because their conduct is not sufficiently similar to Plaintiff's conduct. Defendants assert three reasons why Holmes and Walters are not proper comparators: (1) Plaintiff was the only employee not to place his lock on any portion of the reclaimer; (2) it was Defendants' "past practice" not to enforce locking the travel; thus, because the travel lockout procedure was not "clearly communicated," Defendants would not have "just cause" to terminate any employee for failing to lock out under the collective bargaining agreement; and (3) Plaintiff's conduct resulted in greater safety risk because "the main chain travels much faster than the travel and [Plaintiff] could not have escaped injury had the chain been activated while [Plaintiff] was working."[49] The Court, however, finds these arguments to be distinctions without a difference. These are arguments that

---

[49] MSJ, Doc. 25-1 at 11.

16

are relevant to the pretext analysis—whether a jury could disbelieve the alleged legitimate nondiscriminatory reason for treating Plaintiff differently—not to the quality of the employees' conduct.[50]

Defendants' stated reason for Plaintiff's termination was his violation of the zero-tolerance policy for failing to properly lockout, not his failure to abide by past practice.[51] Under Cemex's zero-tolerance policy there is no stated or permissible exception for "past practice," no exception for varying levels of dangerousness of equipment, no exception for applicability with collective bargaining agreement, and no exception for an employee putting a lock on a part of the reclaimer, even if it is not on the proper part of the reclaimer required under procedure to lock out.  In other words, according to the zero-tolerance policy there is no differentiation between the conduct of locking the travel and locking the main chain; both are failures to follow lockout/tagout procedures, and both are violations of the policy. Indeed, Stamback admits that there was no "leeway" in his application of the policy—termination was required—and yet, he applied the policy differently to Plaintiff than he did to Walters and Holmes.  Holmes and Walters were subject to the same policy, failed to properly lock out, and yet they were not terminated; therefore, they were treated more favorably than Plaintiff for nearly identical conduct.

---

[50] Pl. Resp. Br., Doc. 28 at 3.

[51] Plaintiff contends that because he was "walking" and not working at the time Stamback came to inspect, he did not need to have his lock on the main chain. Pl. Resp. Br., Doc. 28 at 5.

In determining comparators "exact correlation is neither likely nor necessary, but the cases must be fair congeners."[52] The Court finds that because Holmes and Walters were subject to the same policy as Plaintiff, violated the same policy as Plaintiff, are of a different race than Plaintiff, and were treated more favorably than Plaintiff, Plaintiff has presented "fair congeners" sufficient to maintain a *prima facie* case.

**Legitimate Non-Discriminatory Reason**

Because Plaintiff has established his *prima facie* case of discrimination, the Court must determine whether Defendants have offered a legitimate nondiscriminatory reason for his termination.  The burden is one of production, not persuasion, and the Defendants need only produce credible evidence supporting the decision: they "need not persuade the court that [they were] actually motivated by the proffered reasons."[53] If the employer meets its burden of production, the presumption of discrimination raised by the plaintiff's prima face case is rebutted and thus disappears."[54]

Defendants assert one singular reason for Plaintiff's termination: he violated "a policy for which clear violations are not tolerated."[55] This is a legitimate

---

[52] *Silvera v. Orange County Sch. Bd.*, 244 F.3d 1253, 1259 (11th Cir. 2001) (internal quotations and citations omitted).

[53] *Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc).

[54] *Smith*, 644 F. 3d, at 1326.

[55] MSJ, Doc. 25-1 at 11. Plaintiff contends Defendants' burden "is to rebut the presumption of discrimination by producing evidence that the plaintiff was [terminated], or someone else was [not disciplined as severely], for a legitimate, nondiscriminatory reason." *Burdine*, 450 U.S. at 255 (emphasis added). They further assert that because Defendants offer no argument or evidence outside of Plaintiff's

nondiscriminatory reason "that might motivate a reasonable employer" to terminate an employee.[56] Thus, Defendants have satisfied their "exceedingly light" burden of producing a legitimate nondiscriminatory reason, and the burden now shifts to the Plaintiff to establish pretext.

**Pretext**

To establish pretext a "plaintiff must demonstrate that the proffered reason was not the true reason for the employment decision. . . . [The plaintiff] may succeed in this <u>either</u> directly by persuading the court that a discriminatory reason more likely motivated the employer <u>or</u> indirectly by showing that the employer's proffered explanation is unworthy of credence."[57] However, "if the employer proffers more than one legitimate nondiscriminatory reason, the plaintiff must rebut each of the reasons to survive a motion for summary judgment."[58] "Conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [an employer] has offered . . . extensive evidence of legitimate,

---

"alleged" violation of the zero-tolerance policy, they have not "articulat[ed] a legitimate nondiscriminatory reason for the difference in treatment" between Plaintiff, Holmes, and Walters, and thus they have failed to meet their burden of production and failed to rebut the presumption of discrimination established by Plaintiff's *prima facie* case. Pl. Resp. Br., Doc. 28 at 8. The Court, however, is unconvinced that Defendants have failed to meet their burden of production by asserting that Plaintiff was terminated for violating the zero-tolerance policy.

[56] *Chapman*, 229 F.3d at 1030.

[57] *Jackson v. State of Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005) (emphasis added) (quotations and citation omitted).

[58] *Crawford v. City of Fairburn, Ga.*, 482 F.3d 1305, 1308 (11th Cir. 2007).

non-discriminatory reasons for its actions."[59]  Evidence establishing pretext may include the same evidence initially offered to establish the *prima facie* case of discrimination.[60] Indeed, as to the existence of pretext, "the plaintiff is not required to introduce evidence beyond that already offered to establish the prima facie case."[61]  Moreover, although a jury may not ultimately infer discriminatory intent from Plaintiff's showing of pretext, if the inference is raised by the record, summary judgment is precluded.[62]

Plaintiff has sufficiently raised genuine issues of material fact as to whether Defendants' stated reason for Plaintiff's termination is unworthy of credence.[63]  As explained above, viewing evidence in the light most favorable to Plaintiff, Plaintiff, Holmes, and Walters are proper comparators who all failed to lock out their equipment, but were treated differently.  All three were subject to the same zero-tolerance policy—a policy that provides no exceptions for violations—and yet Holmes and Walters were not terminated for failing to lock out, while Plaintiff, an African American, was.  It is undisputed that the zero-tolerance policy makes no differentiation between the conduct

---

[59] *Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1376 (11th Cir. 1996) (quotations and citation omitted).

[60] *Wilson v. B.E. Aerospace*, 376 F.3d 1079, 1088 (11th Cir. 2004).

[61] *Mulhall v. Advance Sec. Inc.*, 19 F. 3d 586, 598 (11th Cir. 1994) (citations omitted).

[62] *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 146 (2000).

[63] Plaintiff asserts that because Defendants only raised the arguments in the "prima facie" section of their brief, Defendants' arguments cannot be "imported" into the pretext analysis; thus, Defendants have waived any argument rebutting Plaintiff's reasons for pretext.  Pl. Resp. Br., Doc. 28 at 13.  The Court notes that Plaintiff again confuses Defendants' burden in the burden-shifting analysis. It is Plaintiff's burden, not the Defendants, to present sufficient evidence to create a genuine issue of material fact that Defendants' proffered legitimate reasons for termination are merely pretext for race discrimination.

of locking the travel and locking the main chain; both are a failure to follow lockout/tagout procedures and both are violations of that policy. A typical means of establishing pretext is through comparator evidence.[64] "If a plaintiff attempts to show pretext by comparing his own treatment to the employer's treatment of similarly situated white employees, the plaintiff and the employee [he] identifies as a comparator must be 'similarly situated in all relevant respects.'"[65] The jury could find that because Plaintiff was the "first employee" to violate the zero-tolerance policy, Defendants' reason for terminating Plaintiff because of "strict compliance" with the zero-tolerance policy is suspect, when at the same time the "first" violation occurred, two other violations simultaneously took place, but were treated differently. Moreover, sufficient evidence exists from which a reasonable jury could find that Defendants' reason for terminating Plaintiff was motivated by race.

Defendants' proffer several explanations in an effort to show that Stamback was not motivated by race.[66] Defendants point to "past practice" of not requiring the travel

---

[64] *Silvera*, 244 F.3d at 1259.

[65] *Jackson v. Winn-Dixie, Inc.* 353 Fed. Appx. 179, 181 (11th Cir. 2009) (quoting *Rioux*, 520 F. 3d at 1280).

[66] Along with the following reasons, Plaintiff also asserts in a footnote that because Stamback knew Plaintiff had been involved in another employee's (Danny Solomon) internal complaint regarding race discrimination a month before his termination, this could be inferred by the jury as general "bias against the African-American repairmen." Pl. Resp. Br., Doc. 28 at 16 n. 23. It is unclear to the Court whether Plaintiff cited this in support of his original claim of a hostile work environment, which has now been dismissed, or as a question of fact to which the jury could find that Stamback was generally motivated by racial animus. However, the Court is unconvinced that another employee's grievance is relevant where Plaintiff himself did not file such a grievance

21

to be locked out.  However, there is no permissible exception for "past practice" under the zero-tolerance policy. More importantly, no evidence exists of an employee cited for violating the policy, and where past practice was cited as an exception outside of Holmes and Walters.[67]

Additionally, Defendants cannot enforce some practices and not others.[68] Plaintiff claims he was also abiding by a "practice", which he tried to explain to Stamback.  Plaintiff claims there was a practice of relying on a repairman (i.e., Holmes) on one end of the machine to lock out the individual locks on the breaker and shut the machine on and off, while the other repairman (i.e., Plaintiff) worked on the opposite end of the machine.  Therefore, a reasonable jury could find that Defendants made an exception regarding "past practice" for Holmes and Walters, while no exception or "leeway" was granted to Plaintiff.  Because Defendants proffer the zero-tolerance policy

---

even if the Court was to accept that Plaintiff was present in a meeting with Solomon and Andy Marzen regarding Solomon's grievance.

[67] Although Defendants point to the arbitrator's finding that their termination of Holmes for failing to look out the "roller mill" was not considered to be for "just cause," this does little for their argument regarding "past practice" exceptions to the zero-tolerance policy.

[68] There is evidence in the record that "bad habits" or "practices" had developed and yet were not found, previous to Plaintiff, to be violations of the policy. Stamback Dep., Doc. 31-3 at 72-73, 78. Moreover, two contractors were terminated for violations of the lockout policy, but there is no evidence which equipment or part of the equipment was not locked out.  Andy Marzen was terminated, subsequent to Plaintiff, for failing to follow the lockout procedure; however, no specific part of the equipment was cited in the failure to lock out.  Nor was any specific portion of the equipment cited in regards to the two contractors that were terminated under the zero-tolerance policy. Subsequent to Plaintiff, the only evidence of an employee being terminated for a lock out violation, where there was any mention of the piece of equipment not locked out, was the termination of Ernest Holmes, who later forgot to lock out a "roller mill."

as the stated reason for Plaintiff's termination, not failure to abide by a past practice, a reasonable jury could infer that Defendants' differing treatment of the employees that violated the same policy and the same procedure at the same time was based on the one distinguishing feature between the repairmen: their race.

Defendants also contend that they were not motivated by race as evidenced by the fact that Stamback only made the decision to terminate after he presented Frans Meens with an anonymous and race-neutral hypothetical. However, Stamback's hypothetical only told of Plaintiff's failure to lock out the main chain; it did not present the issue of Holmes' and Walters' failure to lock out the travel at all. Defendants, in their Reply, contend that Stamback only knew of Holmes' and Walters' violations after his conversation with Meens and after his decision to terminate Plaintiff.  However, there is evidence in the record that Stamback knew of Holmes' and Walters' failure to lock out the travel and that it was a violation of the zero-tolerance policy pervious to his actual termination of Plaintiff.  Moreover, a jury could infer that Stamback's failure to pose a similar race-neutral hypothetical in regards to Holmes and Walters, even after learning of their lockout violation, colors Defendants' differing treatment of Plaintiff, Holmes, and Walters suspect.

Defendants also point out that Plaintiff was at a greater safety risk by his violation. However, a reasonable jury could find that Stamback knew that both violations were safety risks. According to the zero-tolerance policy, failure to

lockout/tagout is a "Class A-Imminent Danger" violation that places "an employee in immediate danger of serious bodily injury or death from one potential event."[69] No distinction is made regarding the types or parts of equipment required to be locked out, such as the travel and the main chain. A jury could also find that the citation to "risk" is irrelevant because the reason for termination was the violation of the zero-tolerance policy, which does not allow for an exception based on a spectrum of risk; and thus could infer that the disparate application of the policy was motivated by the only distinguishing feature of the employees—race. Defendants assert that Plaintiff's failure to lock out the main chain was perceived as a "greater risk" because the main chain moves faster than the travel.[70]   However, the record shows that the travel allows the entire reclaimer to move, which could knock an employee over and thus the potential of "serious injury or death."   Therefore, a jury could find that the level of "risk" present of being knocked over by large piece of mining equipment is just as dangerous as potential dismemberment.

Defendants also make much of the fact that a repairman is potentially at risk when his individual lock is not placed on the group lock. However, although Plaintiff ultimately could have been at risk of injury if the three other individual locks and the group lock had been removed from the main chain, he was not at any imminent risk as

---

[69] Doc. 32-2 at 7.

[70] The Court notes that Plaintiff objects to these statements as improper opinion evidence. *See supra* note 10.

long as those locks were present because the main chain could not move.[71]  In fact, it was Holmes and Walters, by not having their individual locks on the travel who were actually at imminent risk because nothing was stopping the travel from being energized and moving the reclaimer and the chute, ultimately knocking them over and potentially seriously injuring them. Therefore, a jury could find that the "risk" weighs against Stamback's decision to terminate Plaintiff and not Holmes and Walters as well, because at the time Plaintiff was not in imminent danger, whereas Holmes and Walters were, and thus were actually at greater risk of injury.

Finally, Defendants contend that the need to lock out the travel had not been properly communicated in the past. However, even if Defendants did not communicate to lock out the travel in the past, there is no evidence that Defendants communicated any differently regarding locking out the main chain. Although it is unclear how Defendants communicated specific look out procedures for each piece of the equipment, the record shows that every employee was trained in the zero-tolerance policy and general lockout procedures.[72] Thus, failure to communicate could be viewed by a jury as an arbitrary distinction, especially here, where it is unclear what avenues of

---

[71] Stamback said he saw three locks on the group lock at the time of his inspection. Doc. 26-3 at 25.
[72] Small Dep., Doc. 31-1 at 91-92; Stamback Dep., Doc. 31-3 at 73-74, 79, 90-91, 93-97, 99, 105-107, 170-71.

communication occurred between employees and management outside of the official instructions in policy on which every repairman received instruction.[73]

For the first time in their Reply brief, Defendants make the distinction that the zero-tolerance policy required all four repairmen to have had their locks on the travel, and thus Plaintiff actually committed two violations of the policy, whereas Holmes and Walters only committed one.  The Court, however, will not consider arguments raised for the first time in a reply brief and are deemed waived. [74]  Moreover, Plaintiff has not had the opportunity to properly respond.

Therefore, because Plaintiff has raised sufficient evidence to establish genuine issues of material fact as to whether Defendants' termination of Plaintiff was motivated by race, this Court must **DENY** summary judgment.

**SO ORDERED,** this 26th day of March, 2015.

S/  C. Ashley Royal
C. ASHLEY ROYAL,
UNITED STATES DISTRICT JUDGE

JRF/ssh

---

[73] Defendants assert that there is no formal training, only "employee to employee" training regarding the equipment, but it is clear from the record that there was training in the safety policies, even if it is unclear how the specifics of each machine's lockout procedure was communicated. Stamback Dep., Doc. 31-3 at 72; *see also supra* note 72. Moreover, this is a genuine issue of fact that the jury should weigh.

[74] *In re Egeidi*, 571 F. 3d 1156, 1163 (11th Cir. 2009) ( "Arguments not properly presented in a party's initial brief or raised for the first time in the reply brief are deemed waived.").